WESTMORELAND *et al. v.* WESTMORELAND *et al.*

1. Where, on its face, the written color of title under which land has been claimed and held adversely for about fifteen years, during which time there has been no obstacle to bringing suit for its recovery, is ambiguous in respect to whether its terms ought to be construed as a deed conveying land *in præsenti* or as a testamentary paper, public policy and the general principle on which prescription rests require that the doubt should be given in favor of the occupant and against the adverse claimant. For this reason, the trial judge was correct in holding that the instrument in question was sufficient color of title on which to base a valid claim of title by prescription in behalf of the defendants.

2. Of three alterations in the instrument, the one made after its execution was immaterial ; and nothing appearing to show or indicate at what time the other two were made, and they serving properly to render the instrument consistent with itself according to its import in the main body of it, the presumption is that these two were made before the instrument was executed.

June 26, 1893.

Ejectment. Before Judge WELLBORN. White superior court. October term, 1892.

H. H. DEAN, M. L. SMITH and H. H. PERRY, for plaintiffs. WIER BOYD and J. J. KIMSEY, for defendants.

LUMPKIN, Justice.

1. On the 28th day of October, 1839, Robert Westmoreland executed and delivered to his son, Reaves Westmoreland, a paper of which the following is a copy: "Georgia, Habersham County.

" This instrument of writing is written for the purpose of showing the condition of a certain piece of land that I give my son, Joseph Westmoreland, conditionally, and the condition is, that he may have all privilege of cultivation himself, and all he makes may be subject to his debts or demands of other persons, and when I my-

self am dead, the land shall be his; further, I do not allow any other person to cultivate the land but him or Reaves Westmoreland, my elder son. It is a piece of land [here follows the description]. Joseph has sold his gift to Reaves, which I agree to in the manner as I intended to Joseph. Privilege of timber I claim as long as I live. When I am dead and gone, I intend the land to be his land, except he should die without any heirs, then in that event the land falls back as it was before the gift. Witness this 28th of October, 1839."

It was signed by the maker, and attested by two witnesses. On the 4th day of February, 1861, Robert Westmoreland conveyed the land described in the above instrument to another son, Edmond Westmoreland, by a deed containing the following recital: "it being a parcel of land that I gave my son, Joseph Westmoreland, a lifetime lease on certain conditions, and conditions not complied with, and the said Joseph Westmoreland sold the said [land] to my son Reaves Westmoreland my lifetime." Edmond Westmoreland died during the war. His heirs at law, claiming under the deed to him from Robert Westmoreland, brought an action on the 4th of March, 1892, to recover the land in question from the representatives of Reaves Westmoreland, who had been dead about a year and half when suit was brought. It appears from the evidence that Robert Westmoreland had been dead fifteen or twenty years at the time of the trial, and that Reaves Westmoreland took possession of the land in dispute immediately after the execution of the instrument above copied, and remained in possession up to the time of his death. The evidence was conflicting as to how Reaves Westmoreland held during the life of his father, there being some proof tending to show that he only claimed a lease for the father's lifetime, and other proof to the effect that he claimed to own the land absolutely. Be this as it may, it is quite clear that after the death of his father,

he claimed to hold the land adversely and in his own right as long as he lived, and according to the testimony, this was for a period of not less than fifteen, and probably more than twenty years before the suit was brought against his estate. The jury found for the defendants, and the plaintiffs excepted to the judgment overruling their motion for a new trial. It was contended by the latter that the paper delivered by Robert Westmoreland to his son Reaves did not pass any greater estate than a usufruct of the land described during the life of the grantor, and that as to the disposition of the land after his death, the instrument is testamentary, passed no title whatever, and consequently could not be a color of title upon which prescription could be based. It is, to say the least, extremely doubtful whether this instrument should be treated as a will or as a deed. It is certainly *sui generis*, and we do not suppose one precisely like it was ever made before or will ever be made again. In the view we take of the law applicable, we we deem it unnecessary to decide definitely whether the paper was a deed or not. Reaves Westmoreland was in possession of the land in dispute about half a century; and granting that this possession could not have been disturbed during the lifetime of his father, there was certainly no obstacle in the way of the heirs of Edmond Westmoreland to bringing suit at any time after Robert Westmoreland's death. They waited fifteen or twenty years before doing this, during which period they must have known that Reaves Westmoreland was claiming the land as his own, and that his representatives continued to do so after his death. Under these circumstances, we think that public policy and the general principle upon which prescription rests require that the doubt as to the proper construction of the paper in question should be given in favor of the defendants and against the plaintiffs; and we therefore hold that the·

trial judge was right in ruling that this instrument was at least sufficient color of title upon which to base a valid claim of prescription in behalf of the defendants. Indeed, it would seem almost a mockery of justice, at this late day, to deprive the estate of Reaves Westmoreland of this property, which he had held and enjoyed for a much longer time than the average period allotted to the life of man.

2. As will have been seen, the instrument in question contained the following sentence: "Joseph has sold his gift to Reaves, which I agree to in the manner as I intended to Joseph." After the word "Reaves," in that sentence, the following words, viz: "for the consideration of 125 dollars in hand paid," had been interlined, and then a pen drawn through this interlineation. Although it appears that the interlineation was both made and erased after the instrument was executed, all this was immaterial, for it really made no difference upon what consideration Joseph sold to Reaves. The evidence shows that the real consideration was a horse, saddle, bridle and bear-skin. There were two other slight alterations in the instrument, in the sentence beginning "When I am dead and gone," etc., one changing the word "their" to "his," and the other changing the word "they" to "he." It does not appear when they were made, but as these alterations properly served to render the instrument consistent with itself according to its import in the main body of it, the presumption is that they were made before the instrument was executed.                    ⁻ *Judgment affirmed.*